FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

APR 09 2026

KEVIN P WEIMER, Clerk
By: *Matthew H* Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**CALLIE H. BURT,**

Plaintiff,

v.

**BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA,**

**THOMAS J. VICINO, Ph.D.**, in his official and individual capacities,

and **GRAND RIVER SOLUTIONS, INC.** Defendants.

Civil Action No.

_____

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1 :26 -CV- 1 9 3 6

## I. Preliminary Statement

1.     Plaintiff Callie H. Burt, Ph.D., is a tenured Full Professor at Georgia State University ("GSU"). She brings this action arising from GSU's handling of her disability-accommodation requests, the University's ensuing adverse actions, and the initiation of dismissal proceedings against her tenured appointment. Plaintiff asserts claims under Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., against Defendant Thomas J. Vicino in his official capacity; under Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, against Defendant Board of Regents of the University System of Georgia; under 42 U.S.C. § 1983 against Defendant Thomas J. Vicino in his individual capacity; and under Georgia law against Defendant Grand River Solutions, Inc.

2.     Plaintiff has a medically documented impairment that, when active, substantially limits major bodily functions and her ability to travel, concentrate, speak, and appear in public settings on an inflexible, mandatory schedule. In December 2023, through GSU's accommodation process, she requested two workplace adjustments: permission to teach the department's one expected annual in-person course online when needed for her disability, and remote participation in regularly scheduled faculty meetings when in-person attendance was medically impracticable, or receipt of meeting

1

materials when remote access was not available. Plaintiff did not request permanent fully remote employment.

3.    The requested adjustments were consistent with how Dr. Burt's position had been performed. Since arriving at GSU in 2019, Plaintiff had taught online and attended meetings remotely without negative evaluation. During that period, she received positive annual reviews and, in 2023, was promoted from tenured Associate Professor to tenured Full Professor, which requires excellence in performance. A male colleague in her department with the same rank, supervisor, and essential functions attended meetings remotely and taught online under an ADA accommodation.

4.    Over the next two years, GSU repeatedly characterized Plaintiff's narrow request as one for "fully remote" employment despite at least a dozen written and verbal corrections.

5.    While the request remained pending, GSU issued Plaintiff a formal reprimand for conduct directly related to her accommodation request—conduct GSU had previously approved and simultaneously authorized and that other faculty routinely engaged in without approval or discipline. Plaintiff filed an internal discrimination complaint with the Office of Equity and Civil Rights Compliance, which failed to follow its own published investigative procedure; the complaint remains unresolved more than 700 days later.

6.    On October 8, 2024, GSU issued an accommodation it acknowledged was "ambiguous" because it did not clearly define when Plaintiff could teach or attend meetings online and left key decisions to administrative discretion. Plaintiff appealed; the appeal was accepted, held in abeyance pending EEOC mediation, and later rescinded without a decision ever being rendered. On October 29, 2024, Plaintiff filed an EEOC charge.

7.    After mediation efforts in May and June 2025 did not resolve the dispute and without any further interactive process, GSU issued an "Alternative Accommodation Decision" on August 1, 2025. That letter stated that Plaintiff could not perform the essential functions of her position "fully remotely" and proposed reassignment to a non-tenure-track clinical position with a salary reduction of more than $50,000 and loss of tenure. The letter did not identify the position's full duties, teaching load, research expectations, or other material terms. The letter also did not provide an accommodation for the barriers Plaintiff had identified—namely, inflexible scheduled in-person teaching and meeting obligations.

8.    According to GSU's EEOC position statement, GSU issued the August 2025 decision after consulting Defendant Grand River Solutions, Inc., a private ADA consulting firm retained by the University. GSU stated that Grand River reviewed Plaintiff's file and advised that her provider

2

documentation indicated she was "unable to come to campus." The provider statement Grand River summarized stated that Plaintiff "rarely leaves her home." GSU further stated that it relied on Grand River's characterization in issuing the August 1, 2025 "Alternative Accommodation" decision.

9.    Plaintiff declined the proposed reassignment. On December 9, 2025, she met with Dean Vicino and University General Counsel Kerry Heyward in what the University described as the first step of the Article XII dismissal process. At that meeting, Plaintiff was told she could accept the reassignment, resign, or proceed into dismissal proceedings. She did not accept reassignment and did not resign. University GC Heyward indicated the University was beginning dismissal proceedings. On January 5, 2026, Dean Vicino confirmed that the University was beginning the dismissal process under Article XII of the University Statutes.

10.    Dean Vicino also directed or controlled other actions affecting Plaintiff's work. These included course assignments and new restrictions on remote meeting participation, including denial of remote access to faculty meetings on the stated ground that such meetings were "in person-only"—a new unwritten requirement communicated by the Dean's office and, on information and belief, created or directed by Dean Vicino.

11.    Following GSU's receipt of the EEOC Right-to-Sue letter, on March 2, 2026, Dean Vicino informed Plaintiff that he was discontinuing the dismissal process "at this time" and that he was "allowing" her to teach remotely through the 2026–27 academic year. The letter did not grant a formal ADA accommodation, did not reference the ADA or the interactive process, and limited remote meeting attendance to circumstances "when a remote option is available," while preserving the in-person-only restrictions imposed by the Dean's office.

12.    This action arises from that course of conduct: the handling of Plaintiff's accommodation requests, the University's repeated characterization of her request as one for fully remote employment, the reprimand and other adverse actions that followed, the August 2025 demotion proposal, the initiation of dismissal proceedings against a tenured professor without an identified Article XII ground, and the use of Grand River's false characterization of her medical documentation in support of those actions. Plaintiff seeks declaratory and injunctive relief, compensatory damages to the extent permitted by law, costs, and such other relief as the Court deems just and proper.

3

## II. Jurisdiction and Venue

13. This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4). Plaintiff's claims arise under Title I of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and 42 U.S.C. § 1983. This Court has supplemental jurisdiction over Plaintiff's state law claims against Defendant Grand River Solutions, Inc. pursuant to 28 U.S.C. § 1367(a), as those claims arise from the same common nucleus of operative facts as Plaintiff's federal claims — specifically, the disability accommodation proceedings that produced the adverse employment actions alleged herein.

14. Venue is proper in the Northern District of Georgia, Atlanta Division, pursuant to 28 U.S.C. § 1391(b)(1) and (2). Defendant Board of Regents is a governmental entity that resides in this District, Defendant Vicino is employed and resides in this District, and a substantial part of the events giving rise to the claims occurred in this District. Venue is proper as to Defendant Grand River Solutions, Inc. pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to Plaintiff's claims against Grand River occurred in this District. Defendant Grand River Solutions, Inc. is registered to do business in Georgia as a foreign profit corporation and is subject to personal jurisdiction in this District.

15. On or around October 29, 2024, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), Charge No. 410-2024-06650, alleging disability discrimination, failure to accommodate, and retaliation. On January 12, 2026, the EEOC issued Plaintiff a Notice of Right to Sue. Plaintiff has satisfied all conditions precedent and administrative exhaustion requirements under the ADA.

16. Section 504 claims, Section 1983 claims, and Plaintiff's state law claims against Defendant Grand River Solutions, Inc. under O.C.G.A. §§ 51-5-1 and 51-5-4 and Restatement (Second) of Torts § 552 do not require administrative exhaustion.

## III. Parties

17. Plaintiff Callie H. Burt, Ph.D., is a citizen of the United States and a resident of Georgia. She is a tenured Full Professor in the Department of Criminal Justice and Criminology ("CJC") at Georgia State University, a public research university within the University System of Georgia. She currently serves on the Department Executive Committee and the College Promotion and Tenure Committee,

4

both elected positions. As Principal Investigator on a National Institutes of Health ("NIH") grant, she secured more than $500,000 in research funding for GSU; a pending NIH application seeks approximately $2.3 million in additional funding. Plaintiff is a qualified individual with a disability within the meaning of the ADA and Section 504.

18.   Defendant Board of Regents of the University System of Georgia ("Board of Regents") is the governing body of Georgia's public university system, established under O.C.G.A. §20-3-20 et seq. Georgia State University is a unit of the University System of Georgia. The Board of Regents is the employer of record for GSU faculty. It is a recipient of federal financial assistance within the meaning of 29 U.S.C. §794(b), rendering it subject to Section 504 and constituting a waiver of Eleventh Amendment immunity as to Section 504 claims. With respect to Plaintiff's ADA Title I claims, the Board of Regents retains sovereign immunity from compensatory damages under *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001). Those counts are therefore pleaded for declaratory and prospective injunctive relief, while compensatory damages for the same underlying conduct are sought under the parallel Section 504 counts. The Board of Regents may be served through its principal office at 270 Washington Street, S.W., Atlanta, Georgia 30334.

19.   Defendant Thomas J. Vicino, Ph.D., is Dean and Professor of the Andrew Young School of Policy Studies at Georgia State University. At all relevant times, he acted under color of state law. He is sued in his individual capacity for the constitutional violations alleged herein and in his official capacity for declaratory and prospective injunctive relief under Title I of the ADA. He may be served at 55 Park Place, N.E., Suite 964, Atlanta, Georgia 30303.

20.   Defendant Grand River Solutions, Inc. is a Delaware corporation registered to do business in Georgia as a foreign profit corporation, with its principal office address at 171 Main Street, #212, Los Altos, California 94022. Grand River is an ADA/Section 504 consulting firm that, at all times relevant to this action, was retained by Georgia State University to assess and revise GSU's employee disability accommodation process and to provide case consultation on individual employee accommodation files, including Plaintiff's. Grand River may be served through its registered agent, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

## IV. Factual Allegations

### A. Plaintiff's Position, Qualifications, and Disability

**21.** Plaintiff has been a tenured Full Professor at GSU since her promotion from tenured Associate Professor in 2023. She was hired as a tenured Associate Professor in 2019, having previously earned promotion and tenure at the University of Washington. She has first-authored more than 20 scholarly publications since her arrival at GSU. She teaches courses in criminal justice and criminology, supervises and publishes with graduate research assistants, maintains an active research program, and performs substantial service to her Department, College, University, and professional field, including in elected roles and on editorial boards.

**22.** Plaintiff's annual performance evaluations have consistently rated her as meeting or exceeding expectations across research, teaching, and service. Her promotion to Full Professor in 2023 followed seven levels of review, including external reviewers, department faculty, department chair, College Promotion and Tenure Committee, Dean, Provost, and University President. Promotion to Full Professor required a determination of excellence in performance, and Plaintiff received that promotion with strong external support, including external review letters that GSU administrators described as "glowing" and written by leading scholars in her field. One reviewer noted, " ... this is one of the easiest cases I have assessed for promotion to full professor...".

**23.** Plaintiff has a medically documented disability—an impairment that substantially limits one or more major life activities within the meaning of the ADA, as reflected in medical provider forms and related written communications submitted through GSU's ADA process. Plaintiff's condition is episodic. When active, it creates barriers to inflexible, mandatory in-person attendance at scheduled meetings, in-person classes, and other required in-person events. Plaintiff's inability to attend a particular in-person event on a given day does not establish that she cannot be present in person as a general matter. Likewise, her ability to attend a particular in-person event on a given day does not establish that she can reliably satisfy inflexible, mandatory scheduled in-person obligations without accommodation. The ADA provides that an impairment that is episodic is a disability if it would substantially limit a major life activity when active. The requested accommodation addresses barriers created by inflexible, mandatory in-person scheduling during active periods of her condition.

**24.** Plaintiff's disability does not prevent her from performing the essential functions of her position with reasonable accommodation. From her arrival at GSU in 2019 through her accommodation request

6

in December 2023, Plaintiff taught online courses and attended meetings remotely without negative evaluation or performance review. Plaintiff has years of satisfactory performance under the same working conditions she later requested as a formal accommodation.

25.    In late 2023, following a significant worsening of her condition, Plaintiff submitted a request for accommodation. She provided required forms and medical documentation, met with ADA staff on multiple occasions, and responded promptly and thoroughly to requests for additional information.

26.    Plaintiff's request has been specific and consistent: when needed for her disability, (1) permission to teach the one expected annual in-person course in an online modality, and (2) remote participation in regularly scheduled faculty meetings, or receipt of meeting materials when remote access is unavailable. Plaintiff did not request permanent fully remote employment or elimination of essential functions.

**B. First Accommodation Request and Response (December 2022–May 2023)**

27.    In December 2022, Plaintiff submitted ADA accommodation forms and medical documentation to GSU's ADA/Benefits Office, in accordance with GSU's published accommodation procedures, requesting remote access to faculty meetings. At the time, all of her courses were online. On or around January 6, 2023, Plaintiff met with Workplace Accommodations Manager Teresita Warren to explain her condition and request. On or around February 13, 2023, Warren stated that the University was still engaging in the interactive process and that an interim remote meeting option would be provided pending a final decision. GSU ADA/Benefits then made no further contact for approximately three months.

28.    On May 12, 2023, GSU issued an accommodation letter granting remote meeting attendance with an expiration date in the same month it was issued. A five-month ADA process produced a letter expiring upon issuance. No rationale for the same-month expiration was provided. At the time, Plaintiff's condition was improving, and she hoped her condition would improve sufficiently that she would not need to request broader or renewed accommodations, but that expectation was overtaken by a setback later in 2023.

7

**C. Second Accommodation Request: Delays, Reprimand, and Related Events (December 2023–April 2024)**

29.    On December 15, 2023, Plaintiff submitted a second accommodation request with updated medical documentation, requesting: (1) online delivery of her one designated in-person course; and (2) continued remote meeting participation when medically necessary.

30.    The request was feasible in light of Plaintiff's role, record, and department practice. At the time of the request:

- Since her arrival at GSU in 2019, Plaintiff had already performed the functions of her position under the same conditions she later requested as a formal accommodation.

- During that period, GSU promoted her to Full Professor, a rank awarded only upon a determination of excellence in research, teaching, and 'at least good' in service.

- GSU evaluated Plaintiff's performance arising from those conditions positively. No annual evaluation rated her performance as below expectations or unsatisfactory in any category.

- Student demand for online courses in the department exceeded demand for in-person offerings, and the department regularly, if not always, had to hire additional part-time instructors to meet that demand.

- The department had a newer, informal expectation that all tenured or tenure-track faculty teach one in-person class per year. However, the expectation was routinely unmet and unenforced. During the 2024–2025 academic year, for example, five of the fourteen tenured or tenure-track faculty in CJC did not teach an in-person course, including three Full Professors. None of those teaching only online were penalized or negatively evaluated for their online teaching modality. The Interim Department Chair confirmed the informal status of the expectation at a faculty meeting in fall 2024, stating that there were "no requirements," that the expectation was "more of a guidance," noting faculty had not taught in person that year without consequence, and that there was "nothing firm."

- A male colleague of the same rank, title, supervisor, and department as Plaintiff had for years taught exclusively online and attended meetings remotely under a documented ADA accommodation—a fact confirmed by Respondents's December 15, 2025 Position Statement submitted to the EEOC—without adverse action, confirming that the requested arrangement was

8

operationally feasible within the department.

31.    Notably, Plaintiff's direct supervisor and Department Chair, a faculty member with 25 years of experience at GSU, stated in a June 2025 written letter that Plaintiff could perform her job with the requested accommodation without fundamentally altering the position or departmental operations.

32.    GSU's ADA/Section 504 Process Guide governs the employee accommodation process. Section III.A states that the interactive process is "required by the ADA" and "engages the University and the employee in a dialogue exploring the employee's request for accommodation(s)." That process "incorporates information and recommendations from the employee's qualified healthcare provider and information regarding the essential functions of the employee's position," "fosters timely and effective implementation of identified reasonable accommodations," and "results in a formal determination of workplace accommodation(s) . . . memorialized in the employee's Accommodation Plan."

33.    GSU did not engage Plaintiff in a genuine dialogue, did not provide timely determinations, did not identify essential functions to her in a manner that would permit meaningful engagement, and did not produce an Accommodation Plan reflecting an individualized analysis of her request.

34.    In the multi-year process, GSU did not provide a coherent, individualized, or consistent analysis of which specific essential functions of Plaintiff's actual position could not be performed with her requested accommodation, despite Plaintiff's repeated requests for such information.

35.    Shortly before the December 2023 accommodation request, Department Chair Leah Daigle invited Plaintiff to chair the Department's five-year Academic Program Review Committee, writing that she wanted a "thoughtful" leader "who would take this role seriously." In follow-up correspondence, Dr. Daigle stated that "much of the committee work can be done virtually."

36.    On January 4, 2024, during an intake meeting, Warren stated that a decision would issue by January 19, 2024. Relying on that representation, Plaintiff temporarily moved the first meeting of her Spring 2024 course online and informed students that the change might become permanent, acknowledging transfer options. This same course was previously (in 2022) taught by Plaintiff in an online modality with very positive student evaluations, among the highest of her career.

37.    On January 19, 2024, Warren informed Plaintiff that the process was still ongoing and no decision issued. For two additional class meetings, Plaintiff moved the course meeting online, explaining clearly to students that the change was temporary, with the possibility it might become permanent, and that she was awaiting clarification from the University, which had represented that a decision was imminent.

**38.** On January 24, 2024, Plaintiff's Department Chair admonished her for moving the course online while the accommodation request remained pending. ADA staff subsequently stated that Plaintiff was expected to teach in person during the pending process. Plaintiff explained that she could not do so consistent with her medical limitations. The Department Chair then authorized Plaintiff to continue teaching the course online while the request remained unresolved.

**39.** Approximately six weeks later, Plaintiff received a formal written reprimand for changing the modality of the course. The reprimand arose from conduct for which Plaintiff was seeking accommodation and was issued after she had been permitted to proceed in that manner while the request remained pending. In the same communication, the Department Chair reaffirmed that Plaintiff could continue teaching the course online during the pending process. The University thus issued formal discipline for online teaching of the course while simultaneously reaffirming its permission for Plaintiff to continue teaching the course online.

**40.** The reprimand was unusual in context. Plaintiff had never before received, or even heard of, a written reprimand in an academic setting. In CJC, and in the departments where Plaintiff had previously served, faculty routinely moved individual class meetings online or cancelled class for illness, professional travel, or emergency caregiving without seeking permission from the department chair. Those temporary adjustments were treated as ordinary incidents of faculty discretion, not as disciplinary matters.

**41.** The March 2024 reprimand is the only disciplinary notation in Plaintiff's personnel file, which otherwise consists of uniformly positive evaluations, promotions, and external praise. Faculty in the department routinely adjusted class modality or scheduling without discipline. Plaintiff confirmed with colleagues that they had not sought permission for comparable adjustments and had not been disciplined for doing so.

**42.** Dr. Daigle later acknowledged to Plaintiff in a meeting with the University Ombudsperson that she had issued the reprimand because "the administration told her to." In that same meeting, she admitted that she was not informed about the objections to Plaintiff's accommodation request and, like Plaintiff, admitted she did not experience the ongoing ADA process as interactive.

**43.** Following a meeting with the University Ombudsperson regarding the accommodation process, Plaintiff was directed to ADA/504 Coordinator Kieran Morrow, who in turn directed her to Deputy Chief Human Resources Officer Monica Javia.

**44.** On or around March 18, 2024, Plaintiff met with Deputy Chief Human Resources Officer Monica

Javia to raise concerns about the accommodation process. Plaintiff noted that she had not been informed about the cause of process delays, the department's response to her request, or any essential functions analysis — none of the information necessary to move the process toward resolution. Javia acknowledged that the process as described did not sound interactive and committed to having ADA staff follow up within the week with that information.

**45.** At Plaintiff's request, on or around April 1, 2024, Plaintiff met with ADA staff, Ms. Warren and her supervisor. This was the third such meeting since her December accommodation request. The meeting was audio recorded. GSU ADA staff devoted much of the discussion to asking Plaintiff to propose alternatives that would enable her to comply with fixed, inflexible in-person attendance requirements. In response to explicit questions, staff could not identify any specific essential function requiring inflexible in-person presence, could not explain the department's objections or concerns, and could not meaningfully distinguish Plaintiff's situation from that of her male comparator who had for years taught exclusively online and attended meetings remotely under an ADA accommodation. Staff could not identify any material development in the process over the preceding three months and instead offered unsolicited behavioral advice.

**46.** In early March 2024, Plaintiff was removed from her role as chair of the Five-Year Annual Program Review Committee.

**47.** Throughout the semester, with no accommodation decision, Plaintiff was required to notify students of the course modality week by week, a condition no other faculty member faced. Her teaching evaluations for the course were lower than typical, the same course she had taught online in 2022 with among her highest-ever student evaluations.

**48.** In late Spring 2024, during discussions about identifying a new or interim department chair, Dean Vicino stated to colleagues that Plaintiff was "not eligible" for the position because of a "legal issue." In its EEOC position statement, GSU confirmed that Dean Vicino excluded Plaintiff from consideration for the interim department-chair position because of her disability and/or her accommodation request. The exclusion denied Plaintiff a career-development opportunity that included significant additional compensation, together with course releases and related professional benefits.

### D. Internal Discrimination Complaint Ignored (April 2024)

**49.** On or around April 25, 2024, having sought relief through her Chair, the Ombudsperson, Human Resources, and ADA staff without resolution, Plaintiff filed a formal discrimination complaint with

11

GSU's Office of Equity and Civil Rights Compliance ("OECRC"), alleging disability discrimination, failure to accommodate, and retaliatory discipline. OECRC acknowledged receipt.

50.    OECRC maintains a published Non-Misconduct Investigative Procedure governing disability discrimination complaints. Following intake, the Director of Investigations determines whether to formally investigate, refer to informal resolution, or dismiss, and issues one of three written outcomes accordingly. If formal investigation proceeds, the investigator notifies both the complainant and respondent, conducts interviews, collects evidence, and issues a written report with findings.

51.    Following Plaintiff's April 25, 2024 complaint, OECRC conducted intake, requested documents on May 13, 2024, and submitted follow-up questions on July 26, 2024, which Plaintiff answered on July 29, 2024. OECRC did not initiate formal investigation. Instead, more than nine months after the complaint was filed, OECRC directed the matter to informal resolution and designated staff member Chris Griffin as facilitator. On information and belief, no Notice of Allegation of Discrimination was sent to any respondent. No formal findings were issued and the informal resolution process produced no outcome. As of the filing of this complaint, more than 700 days have elapsed since Plaintiff filed her internal discrimination complaint and no written disposition of any kind has issued. Plaintiff's most recent request for a status update went unanswered.

### E. Ten-Month Pattern of Procedural Deficiencies (January–September 2024)

52.    Between December 2023 and October 2024, GSU's ADA office engaged in a prolonged review process marked by delay, repeated requests for information, and mischaracterization of Plaintiff's request. Key events include:

- GSU repeatedly characterized Plaintiff's request as one for "100% remote work" or "fully remote employment" in formal determinations, written communications to Plaintiff, and correspondence to her provider, despite multiple written and verbal corrections clarifying the request and acknowledging receipt of clarifications.

- Over approximately ten months, despite being asked repeatedly in meetings and written communications, GSU never identified to Plaintiff any specific essential function of her position that could not be performed with the requested accommodation and that was consistently applied and enforced among comparable faculty in her department. When functions were referenced, they included activities such as hosting visiting professors, campus tours, internship receptions, graduation ceremonies, and happy hours with graduate students—activities Plaintiff identified in

12

writing as marginal functions not central to the job's existence, a characterization GSU did not dispute.

- During this period and for years preceding it, a male colleague of the same rank, title, supervisor, and department taught online and attended meetings remotely under an ADA accommodation. GSU staff did not identify a material distinction between his position and Plaintiff's, even when asked.

- GSU repeated substantially similar follow-up questions to Plaintiff and her provider across multiple communications, including meetings in January, February, and April 2024, a July 29, 2024 fax to her provider, and a September 23, 2024 written communication to Plaintiff. Plaintiff responded to those inquiries each time noting that the questions had been "asked and answered" at prior meetings.

- The September 23, 2024 written questions from ADA staff to Plaintiff included inquiries unrelated to the functional limitations at issue, including whether Plaintiff attended medical appointments remotely or in person, and stated that failure to respond could be treated as withdrawal from the interactive process. Plaintiff noted she objected to the nature of the questions but was willing to answer anyway.

- GSU transmitted follow-up medical inquiries to Plaintiff's provider at an incorrect fax address on multiple occasions without notifying Plaintiff and attributed the resulting delay to non-response. Plaintiff later determined that the delay resulted from GSU's transmission errors.

- On September 25, 2024, in an email, ADA staff suggested exploring reassignment to positions that could be performed "100% remotely"; Plaintiff corrected that that being "100% remote" was not her request.

53.    On September 25, 2024, Plaintiff wrote directly to Dean Vicino and her Interim Chair seeking direct dialogue after ten months without resolution. She affirmed her commitment to "at least occasional on-campus presence" and asked them to identify which essential functions required in-person presence, characterizing items on GSU's list—attending happy hours with graduate students, hosting visiting professors, campus tours—as marginal rather than essential. Neither disputed that characterization. In his September 27 response, Dean Vicino identified no specific essential function requiring in-person presence, stating only that "various aspects of teaching, research, and service will require you to come to campus occasionally," which was consistent with

13

Plaintiff's request.

**54.** By no later than September 27, 2024, Dean Vicino had received and responded to an email clarifying that Plaintiff's request was not for fully remote work and that she had committed to occasional on-campus presence, consistent with his own characterization of what the position required.

**55.** Eleven days later, GSU issued an accommodation letter characterizing Plaintiff's request as one for fully remote work.

**F. The October 2024 Accommodation Letter**

**56.** On October 8, 2024, nearly ten months after Plaintiff's request, GSU issued an "ADA Accommodation Confirmation Letter." Rather than granting Plaintiff's requested accommodations, the letter characterized her request as one for "fully remote work," stated that online instruction and virtual meeting attendance would be available only when permitted by University or departmental needs, required unspecified "intermittent in-person" attendance, and left modality and participation decisions to supervisor or leadership determination rather than providing a defined accommodation.

**57.** In transmitting the letter, Ms. Warren invited Plaintiff to follow up with questions. Plaintiff did so on October 11, 2024. On October 23, 2024, the day after the ten-day appeal period stated in the October 8 letter would have expired, Warren responded by again characterizing Plaintiff's request as "fully remote work indefinitely" and "100% remote work in perpetuity," acknowledged that the October 8 determination was "somewhat flexible/ambiguous," and stated that "[t]he other option" would be to say Plaintiff was "not qualified to be a full, tenured professor since [she] can never come to campus."

**58.** In the same October 23 email, Warren responded to Plaintiff's questions about which functions required in-person presence by stating: "There isn't necessarily one single type of task that is always required to be in-person." Warren directed Plaintiff to Deputy Chief Human Resources Officer Monica Javia if she had further questions.

**59.** On October 29, 2024, Plaintiff filed an EEOC Charge of Discrimination against GSU alleging failure to accommodate, discrimination, and retaliation.

**60.** On or around November 10, 2024, Plaintiff wrote to Deputy Chief Human Resources Officer Monica Javia with detailed written objections, specific questions about essential functions, and a direct inquiry whether GSU claimed undue hardship. In that email, Plaintiff clarified the scope of her request in unmistakable terms: "My request is not and has never been to be 'fully remote' (i.e., never present in person) in perpetuity. That is a misunderstanding of my request. At no time over

14

this nearly 11-month process have I requested to 'never come to campus.' I have a disability, on the basis of which I am requesting an accommodation to allow me to telework when necessary. Specifically, I am requesting accommodations for inflexible, in-person activities, given the challenges due to my disability at this time. By inflexible activities, I mean activities that are regularly scheduled and cannot be easily changed, i.e., committee or faculty meetings and classes. I am not seeking accommodations for flexible meetings such as meetings with colleagues or with graduate students, which I can flexibly and sporadically schedule, and which can be rescheduled or cancelled if I am unable to attend without too much disruption."

61.    Two days later, Javia responded that she had read Plaintiff's entire email and believed Plaintiff would be better served by pursuing the ADA appeals procedure. She attached the appeal guidance but did not answer Plaintiff's substantive questions.

62.    Plaintiff advised Javia that she believed continuing the interactive process would be preferable, but that she would follow Javia's direction and pursue an appeal.

### G. The Appeal Process: Suspension, Reversal, and Record Exclusion

63.    On November 12, 2024—the same day Javia directed Plaintiff to pursue an appeal—Plaintiff submitted a formal appeal of the October 2024 accommodation determination. The appeal asserted that the determination failed to remove the barriers created by inflexible in-person obligations; that the requested accommodation was reasonable given the parallel arrangement provided to a male colleague of the same rank under an ADA accommodation, the conditions under which Plaintiff had received positive evaluations and promotion to Full Professor, and the absence of any identified undue hardship; and that the determination reflected procedural error, substantive error, and bias against invisible disabilities.

64.    On November 26, 2024, ADA Coordinator Kieran Morrow emailed Plaintiff that she "d[id] not need to submit an appeal at this time," that GSU had agreed to EEOC mediation, that if mediation is declined or unsuccessful, she "will waive [the] original deadline for filing an accommodation appeal, which was 10 days after issuance of [the] accommodation decision," and that the matter "is eligible for appeal based on the grounds [Plaintiff] stated."

65.    Nearly a year later, after no appeal decision had been rendered, Morrow reversed course and stated that she had "misspoken" when she waived the deadline and that the October 2024 appeal would not be considered because it was late. Plaintiff had appealed the same day Javia directed her to

do so.

66.    In late 2024, the parties agreed to EEOC mediation, scheduled for June 2, 2025. In May 2025, OECRC asked Plaintiff to participate in a separate internal informal-resolution process it described as distinct from the EEOC proceeding.

67.    OECRC staff member Chris Griffin was designated as mediator and asked Plaintiff to meet on multiple occasions before the internal mediation session. Because OECRC was simultaneously the office responsible for deciding Plaintiff's appeal, Plaintiff cooperated through multiple meetings, emails, and follow-up exchanges, including requests for information that appeared unrelated to any proper mediation purpose.

68.    GSU designated Dean Vicino and former Chair Daigle, then Associate Dean for Faculty Affairs, as its representatives in the internal mediation. The session proceeded through Griffin and Morrow shuttling between the parties rather than through direct communication. During the May 20, 2025 internal mediation session, Morrow disclosed Plaintiff's specific medical diagnosis to Dean Vicino and Dr. Daigle without Plaintiff's advance knowledge or consent and despite prior written assurances that her diagnosis would not be shared outside Human Resources. At the same time, Morrow remained the designated administrator responsible for deciding Plaintiff's ADA appeal and unresolved discrimination complaint.

69.    The EEOC mediation was held on June 2, 2025. GSU did not resolve the matter.

70.    Within approximately two months of the failed mediations, and without new medical information, renewed interactive engagement, or any change in Plaintiff's performance record, on August 1, 2025, GSU issued an "Alternative Accommodation Decision" that provided no accommodation in Plaintiff's existing position and instead proposed reassignment to a lower-paid, non-tenure-track role.

71.    The August 1, 2025 letter, which again characterized Plaintiff's request as one for "fully remote work," proposed reassignment to a non-tenure-track Clinical Professor position at $94,000 annually — more than $50,000 below Plaintiff's current salary and without tenure — but did not describe the position's duties, teaching load, research expectations, reporting structure, or other material terms, and did not state whether the position was vacant.

72.    The August 1 decision proposed reassignment to an inferior position and provided no remote meeting access or other modification to the inflexible in-person obligations that were the subject of Plaintiff's accommodation request. The letter stated only that fully remote work "could be deemed reasonable" in the proposed position, and was silent on meetings.

16

**73.** GSU's EEOC Position Statement explained that the August 2025 decision followed a recommendation from Grand River Solutions, Inc., an external ADA consulting firm retained to assess and revise GSU's accommodation process and to provide case consultation on individual files, including Plaintiff's. Plaintiff's accommodation file was transmitted to Grand River without her knowledge or consent. The ADA authorization form Plaintiff executed permitted GSU to speak with "appropriate University personnel" and Plaintiff's health care professional; Grand River was an external contractor. Plaintiff first learned of Grand River's involvement from GSU's EEOC Position Statement, received on or around January 12, 2026.

**74.** GSU acknowledged in its EEOC Position Statement that it relied on Grand River's characterization of Plaintiff's file in issuing the August 1, 2025 decision. According to that statement, Grand River characterized Plaintiff's provider's statement that Plaintiff "rarely leaves her home" as meaning that Plaintiff was "unable to come to campus." During the period under review, Plaintiff was in fact present on campus.

**75.** The provider statement on which Grand River purported to rely stated that Plaintiff "rarely leaves her home," which is a description of frequency, not categorical incapacity.

**76.** On August 7, 2025, Plaintiff appealed the August 1, 2025 reassignment decision. ADA Coordinator Morrow accepted the appeal.

**77.** OECRC had not resolved Plaintiff's discrimination complaint, had sought information during the internal mediation process that appeared unrelated to mediation, had disclosed Plaintiff's diagnosis to the administrators whose conduct was at issue, and had then appeared as a University representative in the EEOC mediation. On August 13, 2025, Plaintiff wrote to Griffin asking how OECRC's apparent representation of the University could be reconciled with the neutrality it had previously projected. She received no response.

**78.** In September 2025, Morrow informed Plaintiff that the August 2025 appeal would be referred to the Georgia Institute of Technology for external review, stating that Legal Affairs had advised that it was University and system practice to refer appeals presenting potential conflicts of interest to another institution, although no written policy guidance existed.

**79.** Plaintiff did not give unqualified consent to the referral. She requested that the review encompass both the October 2024 and August 2025 accommodation decisions, that the correspondence preserving her October 2024 appeal rights be included, and that her clarifying submissions be transmitted. In the alternative, she requested leave to expand the August 2025 appeal to include the

October 2024 determination, her April 2024 discrimination complaint, and related events.

80.    GSU nevertheless transmitted the matter to Georgia Tech on terms Plaintiff had not accepted. The external reviewer received only a redacted Benefits file, not the full appeal record. Excluded were Plaintiff's November 2024 appeal, her April 2024 discrimination complaint, her detailed submissions regarding procedural defects, her comparator evidence, and her performance record. The reviewer's authority was expressly limited to the August 2025 accommodation decision.

81.    GSU later acknowledged in its EEOC Position Statement that it did not transmit Plaintiff's appeal documents concerning the 2024 accommodation decision to Georgia Tech. GSU also disclosed in that statement that portions of the 2025 appeal had been redacted, including material on pages 4–5, which on information and belief included comparator evidence.

82.    On October 29, 2025, the external reviewer upheld the August 2025 reassignment decision, finding the process adequate and final while simultaneously "encourag[ing] [GSU] to continue collaborative dialogue with the Appellant to identify potential reassignment options consistent with the ADA and institutional needs."

83.    On or around November 17, 2025, Plaintiff submitted a written rebuttal identifying factual, procedural, and analytical errors in the determination and offering to continue the interactive process in good faith. On November 20, 2025, Morrow acknowledged receipt but did not engage or initiate any further interactive process.

## H. Dean Vicino's Initiation of Dismissal Proceedings

84.    On November 24, 2025, Dean Vicino informed Plaintiff that, because she had declined reassignment to the proposed Clinical Professor position and because GSU maintained that she could not perform her Full Professor role "fully remotely," the University was prepared to proceed to "next steps," including dismissal. He stated that, pursuant to Article XII, Sections 23 and 24 of the University Statutes, the first step in the dismissal process would be a discussion toward "mutual settlement," and invited Plaintiff to meet with him and University counsel.

85.    The grounds for removal under Article XII include professional incompetency or neglect of duty; default of academic integrity in teaching, research, or scholarship; specified criminal conduct; disruption of authorized University activity; false swearing with respect to official documents or statements; violation of Board of Regents policies; and physical or mental incompetency, but only as determined by law or by a medical board of three or more licensed physicians and reviewed by

18

a committee of the faculty.

86.    Dean Vicino did not identify any such ground. Instead, he stated only that Plaintiff had declined reassignment and that, in GSU's view, she could not perform her role "fully remotely."

87.    On December 9, 2025, Plaintiff and her counsel met with Dean Vicino and General Counsel Kerry Heyward for the initial settlement meeting under Article XII. Dean Vicino stated that Plaintiff's performance had been deficient across essential functions for the preceding six years. When asked to identify supporting evidence, he did not do so.

88.    General Counsel Heyward then presented three options: accept reassignment to a non-tenure-track clinical position eliminating tenure and reducing compensation by more than $50,000 annually, resign, or proceed under Article XII. In describing the third option, Heyward stated that Article XII proceedings would be public, open to the community, and subject to open records requests. Article XII provides that the Hearing Committee, in consultation with the president and the faculty member, may exercise its judgment as to whether the hearing should be public or private.

89.    Plaintiff's counsel challenged the basis for initiating dismissal proceedings, noting that Plaintiff had performed all assigned duties under the exact conditions she was requesting as accommodation, and asked whether any evidence of performance deficiency existed. General Counsel Heyward offered none and returned to the three options.

90.    General Counsel Heyward did not identify any specific Article XII ground and did not dispute that the sole stated basis for dismissal was GSU's position that Plaintiff's request to modify one in-person course per year was incompatible with the essential functions of her position. The meeting concluded with Heyward stating that dismissal proceedings would begin.

91.    On December 29, 2025, Plaintiff wrote to Dean Vicino requesting clarification of whether GSU had made any determination that she was professionally incompetent, in neglect of duty, or otherwise unable to perform her assigned responsibilities, and if so, on what basis.

92.    On January 5, 2026, Dean Vicino responded that GSU was "beginning the dismissal process as outlined in Article XII, Sections 23 and 24 of the University Statutes." He did not identify any determination of incompetency, neglect of duty, or other enumerated ground, stating only that Plaintiff had declined reassignment and could not perform her role on a "fully remote basis."

19

## I. Ongoing and Escalating Restriction of Access to Faculty Governance and Equal Participation

93. After the failed mediations and Plaintiff's refusal of the August 2025 reassignment, the University increasingly restricted her access to teaching, meetings, and faculty governance, withdrawing remote access for activities she had successfully performed remotely for approximately five years.

94. On information and belief, Dean Vicino or his office assigned, directed, or controlled Plaintiff's course schedule, including the in-person assignments that were the subject of her accommodation request, and issued or enforced College-level guidance regarding meeting modality, including new in-person-only requirements.

95. Plaintiff's Spring 2026 teaching assignments were withheld until November 26, 2025, which was approximately six weeks after other faculty received theirs, and she learned of them through a colleague rather than through ordinary administrative channels. She was assigned an undergraduate course meeting twice per week in person, typically assigned to graduate student or part-time instructors rather than tenured professors. Although the Dean and University General Counsel later claimed the assignment reflected a department need, Plaintiff's Chair stated it was "not his choice" and had been made "at the direction of the Dean's office."

96. On the first day of classes, the University reassigned Plaintiff's in-person course to a graduate student instructor without apparent disruption.

97. The same pattern continued with Fall 2026 teaching assignments. On or around January 13, 2026, Plaintiff was again assigned an in-person course and was told the assignment could not be changed because it was a department need. Plaintiff noted that if her pending NIH grant were funded, the University had already agreed she would not teach any courses in Fall 2026, as the grant would buy out most of her teaching load.

98. Plaintiff was an elected member of the Department's Executive Committee, which had conducted meetings remotely throughout her two multi-year terms. In February 2026, she was informed that the committee would now meet exclusively in person because, according to the Dean's office, in-person meetings were necessary for "robust and confidential discussions," and that if she could not attend in person she would be replaced. No prior deficiency in the committee's remote operation had been identified.

99. In mid-January 2026, Plaintiff was nominated for inclusion on the Department's Faculty Senate ballot but was omitted. She was otherwise eligible. The basis for her exclusion is presently unknown

20

and lies within Defendants' control. University Senate meetings are conducted in a hybrid format permitting in-person or remote attendance.

100.  On March 12, 2026, Plaintiff's Department Chair emailed the full department announcing the need to elect a representative to the College Promotion and Tenure ("P&T") Committee, noting that Plaintiff's term was concluding. Faculty often continue in that role for multiple terms. The announcement included guidance from the Dean's office specifying that the position required in-person attendance because this committee deals with personnel matters and instructing faculty to "keep the above in mind" when ranking candidates. No prior in-person eligibility requirement had governed P&T committee service during Plaintiff's term.

101.  The AYSPS Bylaws contain no in-person attendance requirement for P&T committee service or meetings. Article IX, governing the Committee on Promotion and Tenure, specifies the committee's composition, eligibility criteria, and terms of service but imposes no attendance-modality requirement. Article XIII, Section 3 provides that each committee shall determine the frequency and schedule of its meetings. The Bylaws do not identify the Dean's office as having authority to impose eligibility criteria for faculty-elected standing committees. Article VI, Section 9, governing the Faculty Affairs Committee, expressly contemplates participation "virtually or in-person," confirming that virtual participation in committee service is part of the College's governance framework.

102.  On or around April 7, 2026, the Department Chair notified the department that Plaintiff had again been elected to serve as the department's representative to the College P&T Committee, describing it as "an intensive, in-person college committee." Election announcements in the department do not typically characterize committee service in those terms.

103.  College-level guidance under the Dean's control increasingly denied Plaintiff remote access to faculty meetings she had attended remotely for years. At the January 29, 2026 Department faculty meeting, for example, Plaintiff requested remote participation and was denied on the stated ground that "the University Administration has decided faculty meetings may only be in person." When Plaintiff asked which office had made that decision, she was told: "It is expected that all faculty meetings across the College are in-person." Plaintiff was unable to attend in person that day. Plaintiff's male comparator was given remote access to the same meeting.

21

## J. The EEOC Process and Plaintiff's Request for Right to Sue

104.  While pursuing escalating adverse actions against Plaintiff, Defendant Board of Regents, working through OECRC—the same office responsible for Plaintiff's unresolved internal discrimination complaint, her accommodation appeal, and the internal mediation process—requested and received three extensions from the EEOC over approximately six months. The original deadline of June 25, 2025 was extended to August 15, 2025 at OECRC mediator Chris Griffin's request, citing PTO schedules and staffing deficiencies. During that first extension period, GSU transmitted Plaintiff's accommodation file to Grand River, received Grand River's recommendation, and issued the August 1, 2025 Alternative Accommodation Decision. GSU then requested a second extension to approximately November 8, 2025, citing the pendency of the external appeal process that OECRC itself administered. During the third extension period, GSU presented Plaintiff with the demotion-resignation-dismissal ultimatum and, when Plaintiff declined, initiated Article XII dismissal proceedings.

105.  The position statement was ultimately submitted on December 15, 2025, nearly six months after the original deadline. Throughout this entire period, GSU was simultaneously seeking additional time to respond to Plaintiff's federal discrimination charge while steadily escalating adverse employment actions against her. On or around December 23, 2025, Plaintiff requested a Notice of Right to Sue. On January 12, 2026, the EEOC issued the Notice of Right to Sue and provided Plaintiff with GSU's position statement. GSU received notice on or around that date.

## K. Dean Vicino Issues a Revocable Permission That Is Not an Accommodation

106.  On March 2, 2026, roughly seven weeks after GSU was notified of the Right-to-Sue letter and almost 3 months after announcing its initiation, Dean Vicino sent Plaintiff a letter stating that, "after additional consideration and reflection on the informal review conducted by the Senate Executive Committee," he was "discontinuing the dismissal process at this time." He further stated: "in an effort to move forward from the last few years, I am allowing you to teach remotely through the 2026–27 academic year." He added that "[t]eaching assignments beyond that will continue to be determined based on student and department norms and needs," that Plaintiff could attend meetings and engage in service remotely only "when a remote option is available," and that "many meetings in AYSPS are now in person." He also stated that Plaintiff's research, teaching, and service would be evaluated in line with other full-time graduate faculty.

107.  The letter did not reference the ADA, the interactive process, or any legal obligation, and did not

22

address the reprimand remaining in Plaintiff's personnel file.

**108.** The limits of the March 2, 2026 letter became apparent immediately. Ten days after the March 2 letter, Dean Vicino's office transmitted to Plaintiff's department the in-person eligibility criterion for P/T Committee service described above.

**109.** On April 7, 2026, Dean Vicino called a Departmental special meeting for the following day, April 8, 2026, less than 24 hours before the scheduled meeting time. Under Article III, Section 1 of the AYSPS Bylaws, special meetings called by the Dean require at least three days prior notice to each faculty member except in emergencies; no emergency was cited. The meeting was held in Board Room 976—a room fully equipped for hybrid participation. Plaintiff wrote to Dean Vicino that morning identifying the three days notice requirement, noting that her disability may prevent her from attending a meeting, and requesting either that the meeting be rescheduled consistent with the bylaws or that remote attendance be provided. Dean Vicino did not respond.

## V. Claims for Relief

## COUNT I

### Violation of Title I of the Americans with Disabilities Act – Failure to Accommodate 42 U.S.C. §§ 12112(a) and 12112(b)(5)(A) – Against Defendant Thomas J. Vicino, in his official capacity

### (Declaratory and Injunctive Relief Only)

**110.** Plaintiff incorporates all preceding paragraphs.

**111.** Plaintiff is a qualified individual with a disability within the meaning of the ADA. She has a physical or mental impairment that substantially limits major life activities, has a record of such impairment, and has been regarded as having such impairment by Defendant. With reasonable accommodation, Plaintiff can perform the essential functions of her tenured Full Professor position, as demonstrated by her positive evaluations and promotion to Full Professor while working under materially the same conditions later requested as accommodation, and by the existence for years of a materially similar arrangement for a male colleague of the same rank, supervisor, and essential job functions in her department.

**112.** The accommodation Plaintiff requested is reasonable: when needed for her disability, online

23

delivery of the one annual course expected to be taught in person, and remote participation in regularly scheduled faculty meetings, or receipt of meeting materials when remote access is infeasible. Plaintiff's Chair, who has more than 25 years of experience as a GSU faculty member and is directly familiar with Plaintiff's job functions and department needs, attested that she could perform all essential functions of her position with the requested accommodations. On information and belief, GSU did not conduct an individualized undue-hardship analysis and did not determine that the requested accommodation would impose an undue hardship.

**113.** Defendant Vicino, in his official capacity as Dean and as a senior officer of Georgia State University, is a proper defendant for prospective relief and is responsible for ongoing compliance with federal law. The institutional failure to accommodate included conduct by GSU's ADA/Benefits office, Equity and Civil Rights Compliance office, and other University administrators and offices acting within the accommodation process, among other things: (a) issuing an initial accommodation that expired upon issuance; (b) failing for more than ten months to engage in a timely, individualized, good-faith interactive process; (c) repeatedly and persistently mischaracterizing Plaintiff's narrow request for modification of one annual in-person course and remote access to scheduled meetings when needed as a request for fully remote or 100% remote employment in perpetuity, despite repeated written and verbal corrections, and relying on that mischaracterization in subsequent determinations; (d) sending follow-up medical inquiries to an incorrect address while attributing resulting delay to the provider; (e) submitting intrusive and medically irrelevant inquiries outside the permissible scope of ADA medical inquiries, including questions unrelated to the functional limitations at issue, such as whether Plaintiff attended medical appointments remotely or in person; (f) issuing an October 2024 accommodation that was discretionary, admittedly ambiguous, and ineffective; (g) disclosing Plaintiff's specific medical diagnosis to Dean Vicino and Associate Dean Daigle, the administrators whose conduct was at issue in her pending discrimination complaint, without her advance knowledge or consent during the May 20, 2025 internal mediation session, notwithstanding prior assurances that medical diagnosis information would not be shared outside Human Resources; (h) reversing the prior accommodation position without reassessment or renewed interactive process; (i) proposing a demotion as an "accommodation" without conducting an individualized analysis of reasonable accommodation in Plaintiff's existing position and without providing sufficient details concerning the proposed reassignment; and (j) maintaining only a discretionary, time-limited, revocable administrative permission for one aspect of the requested accommodation rather than a stable, defined, legally enforceable accommodation.

**114.** The unauthorized disclosure of Dr. Burt's specific medical diagnosis during the May 20, 2025

internal mediation session constitutes an independent violation of the ADA's medical-information confidentiality requirements. 42 U.S.C. § 12112(d)(3)(B) requires that information obtained through the accommodation process be maintained as a confidential medical record, with disclosure permitted only in limited circumstances, including disclosure to supervisors or managers of necessary work restrictions or accommodations, to safety personnel in limited circumstances, and to government officials investigating compliance. The ADA permits disclosure to supervisors or managers only of those work restrictions or accommodations necessary to perform their duties; it does not authorize disclosure of an employee's specific medical diagnosis where such information is not required for implementation. Here, ADA/504 Coordinator Morrow disclosed Dr. Burt's specific diagnosis to Dean Vicino and Associate Dean Daigle during an internal mediation session, without Dr. Burt's advance knowledge or consent and contrary to prior written assurances that her diagnosis would not be shared outside Human Resources. The disclosure was not made for purposes of implementing any necessary restriction or accommodation, and exceeded the scope of disclosure permitted by the statute. Plaintiff seeks appropriate injunctive relief.

**115.** These failures are ongoing and continue to affect Plaintiff's teaching assignments, access to meetings, participation in faculty governance, and the terms and conditions under which she may remain employed as a tenured Full Professor. The March 2, 2026 letter, issued weeks after a Right-to-Sue letter was issued, does not cure or moot these violations. Under the voluntary cessation doctrine, a defendant's unilateral decision to temporarily cease challenged conduct while retaining authority to resume it does not moot claims for injunctive relief. *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167 (2000). The defendant bears a heavy burden to show that the challenged conduct cannot reasonably be expected to recur. The March 2, 2026 letter does not meet that burden: it permits remote meeting participation only when a remote option is made available, limits remote teaching to one academic year while preserving administrative discretion over future assignments, and leaves Plaintiff subject to adverse evaluation under the conditions it purports temporarily to relax.

**116.** Because compensatory damages are unavailable against the State under Title I of the ADA, Plaintiff seeks declaratory judgment and prospective injunctive relief only under this Count. Compensatory damages for the same underlying conduct are sought under the parallel Section 504 counts.

## COUNT II

**Violation of Title I of the Americans with Disabilities Act – Disparate Treatment Disability**

25

## Discrimination

## 42 U.S.C. § 12112(a) – Against Defendant Thomas J. Vicino, in his official capacity

## (Declaratory and Injunctive Relief Only)

117. Plaintiff incorporates all preceding paragraphs.

118. Defendant Vicino, in his official capacity as Dean and as an officer of Georgia State University who has participated in, enforced, and maintained the ongoing conditions challenged herein, is a proper defendant for prospective declaratory and injunctive relief. Through the actions of Georgia State University officials and offices, and through Defendant Vicino's own actions in maintaining and enforcing the challenged conditions, Plaintiff has been subjected to discrimination in the terms, conditions, and privileges of employment because of her disability, her record of disability, and Defendants' perception of her as disabled, in violation of 42 U.S.C. § 12112(a).

119. That discriminatory treatment included, among other things: (a) excluding Plaintiff from consideration for the department-chair opportunity on the basis of her disability, accommodation request, or asserted "legal issue"; (b) denying Plaintiff remote access to department- and college-level meetings when her disability prevented in-person attendance; (c) proposing reassignment to a non-tenure-track position with a salary reduction of more than $50,000 and elimination of tenure, without providing an accommodation for the barriers Plaintiff had identified; (d) initiating Article XII dismissal proceedings on the asserted basis that Plaintiff could not perform her role on a "fully remote" basis and had declined reassignment; (e) threatening Plaintiff's removal from elected faculty-governance positions because of her disability-related need for flexible meeting attendance; and (f) transmitting to Plaintiff's department, through the Dean's office, an in-person eligibility criterion for service on the College P&T Committee that had not previously existed and is not specified in any governing document, in a call for nominations explicitly noting that Plaintiff's term was concluding, thereby signaling unsuitability for reelection because of her disability-related need for remote participation.

120. Comparably situated faculty without disabilities were not subjected to these adverse actions and restrictions.

121. These discriminatory conditions are ongoing. Under the voluntary cessation doctrine, the defendant bears a heavy burden to show that challenged conduct cannot reasonably be expected to recur. *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167 (2000). The March 2, 2026 letter does not meet that burden for the reasons stated in Count I. Plaintiff seeks declaratory

judgment and prospective injunctive relief only under this Count. Compensatory damages for the same underlying conduct are sought under the parallel Section 504 counts.

## COUNT III

### Violation of Title I of the Americans with Disabilities Act – Retaliation

### 42 U.S.C. § 12203(a) – Against Defendant Thomas J. Vicino, in his official capacity

### (Declaratory and Injunctive Relief Only)

**122.** Plaintiff incorporates all preceding paragraphs.

**123.** The ADA prohibits retaliation against any individual because she has opposed an act or practice made unlawful by the ADA or has made a charge, testified, assisted, or participated in an investigation, proceeding, or hearing under the ADA. 42 U.S.C. § 12203(a). A materially adverse action is one that might well dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006). The standard is objective and considers the cumulative effect of employer conduct.

**124.** Defendant Vicino, in his official capacity as Dean and as an officer of Georgia State University who has participated in, enforced, and maintained the ongoing conditions challenged herein, is a proper defendant for prospective declaratory and injunctive relief. Through the actions of Georgia State University officials and offices, and through Defendant Vicino's own actions in maintaining and enforcing the challenged conditions, Plaintiff has been subjected to retaliation for protected activity in violation of 42 U.S.C. § 12203(a).

**125.** Plaintiff engaged in protected activity under the ADA on numerous occasions, including: (a) requesting disability accommodations on December 15, 2023; (b) filing a formal internal discrimination complaint with OECRC on or around April 25, 2024; (c) participating in EEOC intake proceedings in September and October 2024; (d) filing a Charge of Discrimination with the EEOC on October 29, 2024; (e) questioning and appealing the October 2024 accommodation determination in October and November of 2024; (f) participating in internal mediation and EEOC-conducted mediation proceedings in May and June 2025; (g) formally appealing the August 2025 demotion proposal; (h) declining the August 2025 "Alternative Accommodation" because it did not accommodate the identified disability-related barriers; (i) declining, at the December 9, 2025 meeting with Dean Vicino and General Counsel Heyward, to accept demotion or resignation as alternatives to Article XII dismissal proceedings; and

(j) requesting a Notice of Right to Sue from the EEOC, which was issued on or around January 12, 2026, with notice to GSU.

126. The cumulative pattern of conduct from December 2023 through March 2026 demonstrates escalating adverse action following protected activity. Plaintiff's accommodation request was followed by a reprimand issued for conduct the institution had simultaneously authorized and that other faculty engaged in without discipline; a formal appeal and EEOC charge were followed by a demotion proposal eliminating tenure and reducing annual salary by more than $50,000; and Plaintiff's challenge to that demotion was followed by the initiation of Article XII dismissal proceedings. Apart from the reprimand itself, which Plaintiff alleges was retaliatory and selectively imposed, this escalation was not accompanied by any negative performance evaluation or substantiated finding of incompetence, neglect of duty, or other non-retaliatory basis. Plaintiff received uniformly positive evaluations and was unanimously promoted to Full Professor during this period.

127. The absence of any performance-based explanation for the escalating adverse actions supports the inference that those actions were taken in response to protected activity. The same record that establishes Plaintiff's qualifications undermines any non-retaliatory explanation for the sequence of adverse actions alleged herein.

128. The retaliatory actions included, among other things: (a) the March 2024 formal reprimand, issued for conduct directly tied to Plaintiff's pending accommodation request and for conduct routinely engaged in by other faculty without consequence and approved by the Department Chair; (b) exclusion of Plaintiff from consideration for the department chair position on the basis of a stated "legal issue"; (c) the August 2025 demotion proposal, issued within approximately two months of the failed EEOC mediation, without new medical information, reassessment, or renewed interactive engagement; (d) the initiation of Article XII dismissal proceedings following Plaintiff's refusal to accept demotion or resignation; and (e) the systematic denial of remote meeting access, including escalation in January 2026 after Plaintiff declined to resign or accept demotion and after issuance of the EEOC Right-to-Sue letter.

129. Each adverse action followed protected activity with temporal proximity inconsistent with coincidence. The evidence supports the inference that protected activity, rather than legitimate operational need, explains the escalation.

130. These retaliatory conditions are ongoing and continue to affect Plaintiff's employment, participation in faculty governance, and ability to remain employed as a tenured Full Professor. Under the

voluntary cessation doctrine, the defendant bears a heavy burden to show that challenged conduct cannot reasonably be expected to recur. *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167 (2000). The March 2, 2026 letter does not meet that burden for the reasons stated in Count I. Plaintiff seeks declaratory judgment and prospective injunctive relief under this Count. Compensatory damages for the same underlying conduct are sought under the parallel Section 504 counts.

## COUNT IV

### Violation of Section 504 of the Rehabilitation Act – Failure to Accommodate

### 29 U.S.C. § 794 – Against Defendant Board of Regents

**131.** Plaintiff incorporates all preceding paragraphs.

**132.** Defendant Board of Regents is a recipient of federal financial assistance within the meaning of 29 U.S.C. § 794(b), including federal research grants. By accepting federal financial assistance, the Board of Regents has waived Eleventh Amendment immunity with respect to Section 504 claims. The facts alleged in Count I state a violation of Section 504.

**133.** Compensatory damages under Section 504 require a showing of deliberate indifference—that an official with authority to address the discrimination had actual knowledge that harm to a federally protected right was substantially likely and failed to act on that likelihood. *Liese v. Indian River County Hospital District*, 701 F.3d 334 (11th Cir. 2012); *Silberman v. Miami Dade Transit*, 927 F.3d 1111 (11th Cir. 2019). That standard is satisfied here. Deputy Chief Human Resources Officer Monica Javia, an official with authority to direct corrective action, was informed in March 2024 that the interactive process was not functioning as required and acknowledged that it did not sound interactive, yet failed to ensure that it was remedied. ADA/504 Coordinator Kieran Morrow, the designated administrator responsible for the accommodation process and appeal, had actual knowledge throughout the relevant period that Plaintiff's requests remained unresolved and that the process was generating formal complaints, yet failed to conduct a lawful interactive process or issue an effective accommodation. Dean Vicino, the senior officer responsible for Plaintiff's faculty employment, had actual knowledge of her accommodation requests, her EEOC charge, and the initiation of dismissal proceedings predicated on her disability, yet directed and maintained the conditions that denied her equal participation. Each of these officials had authority to institute corrective measures and failed to act despite actual knowledge that harm to Plaintiff's federally protected rights was substantially likely.

29

**134.** As a direct and proximate result of Defendant's failure to accommodate and unauthorized disclosure of Plaintiff's private medical information, Plaintiff has suffered economic and pecuniary damages, including loss of the department-chair opportunity and its associated professional and financial benefits, valued at approximately $40,000 annually in summer funding plus course releases and related career advancement opportunities for the period of exclusion; harm to her academic career and professional standing; and other economic and pecuniary damages to be proven at trial.

## COUNT V

### Violation of Section 504 of the Rehabilitation Act – Disparate Treatment Disability Discrimination

### 29 U.S.C. § 794 – Against Defendant Board of Regents

**135.** Plaintiff incorporates all preceding paragraphs.

**136.** The facts alleged in Count II state a violation of Section 504. As a direct and proximate result, Plaintiff has suffered the economic and pecuniary damages described in Count IV and additional compensatory damages to be proven at trial. The deliberate indifference standard described in Count IV is satisfied for the same reasons stated therein. Plaintiff is entitled to compensatory damages, injunctive relief, and all other relief available under Section 504.

## COUNT VI

### Violation of Section 504 of the Rehabilitation Act – Retaliation

### 29 U.S.C. § 794 – Against Defendant Board of Regents

**137.** Plaintiff incorporates all preceding paragraphs.

**138.** Section 504 prohibits retaliation against an individual for opposing a practice made unlawful by the Rehabilitation Act or for making a charge, testifying, or participating in any investigation or proceeding. A materially adverse action for retaliation purposes is one that might well dissuade a reasonable worker from making or supporting a charge of discrimination. The cumulative pattern of adverse actions described herein meets that standard. The facts alleged in Count III state a violation of Section 504.

**139.** The deliberate indifference standard described in Count IV is satisfied with respect to the retaliatory conduct. ADA/504 Coordinator Morrow had actual knowledge of Plaintiff's protected activity throughout the relevant period, including her internal discrimination complaint, EEOC charge, accommodation appeals, and participation in mediation proceedings, and failed to prevent or remedy the escalating retaliatory conduct. Dean Vicino, as the senior officer responsible for Plaintiff's faculty employment, had actual knowledge of each protected action and directed or maintained the retaliatory conditions that followed.

**140.** As a direct and proximate result, Plaintiff has suffered the economic and pecuniary damages described in Count IV; harm to her compensation trajectory, including discretionary merit increases within the Dean's control, which have been and foreseeably will continue to be withheld as a result of the same retaliatory conduct alleged herein; and all other compensatory damages to be proven at trial. Plaintiff is entitled to compensatory damages, injunctive relief, and all other relief available under Section 504.

## COUNT VII

### Violation of 42 U.S.C. § 1983 – Fourteenth Amendment Procedural Due Process

### Deprivation of Threshold-Condition Protections Embedded in the Tenure Property Interest and Use of Defective Dismissal Procedures

### Against Defendant Thomas J. Vicino, in his Individual Capacity

**141.** Plaintiff incorporates all preceding paragraphs.

**142.** At all relevant times, Defendant Vicino acted under color of state law in his role as Dean of the Andrew Young School of Policy Studies.

**143.** Plaintiff's tenured appointment constitutes a protected property interest under the Fourteenth Amendment. *Board of Regents v. Roth*, 408 U.S. 564, 576–77 (1972). The scope of a constitutionally protected property interest is defined by the instrument that creates it. *Id.* ("Property interests are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."); *Perry v. Sindermann*, 408 U.S. 593 (1972). Plaintiff's property interest is not tenure in the abstract. It is tenure as defined by the University Statutes, including the conditions those Statutes specify for when the dismissal mechanism may lawfully be invoked and the procedures that govern its use once invoked.

31

**144.** A property interest can include procedural entitlements created by state law or institutional policy. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982). Where an institution's governing documents specify the grounds on which a disciplinary mechanism may be initiated, those grounds are constitutive of the property interest, not merely defenses available to the employee after proceedings begin.

**145.** Article XII of the University Statutes and Board of Regents Policy 08.03.09.01 specifies the grounds on which dismissal of tenured faculty may be initiated. Those grounds are: conviction or admission of guilt of a felony or crime involving moral turpitude; professional incompetency, neglect of duty, or default of academic integrity in teaching, research, or scholarship; unlawful manufacture, distribution, sale, use, or possession of controlled substances, or teaching under the influence of alcohol or illegal drugs in a manner interfering with professional duties; conviction or admission of guilt of a criminal drug offense; physical or mental incompetency as determined by law or by a medical board of three or more licensed physicians and reviewed by a committee of the faculty; false swearing with respect to official documents filed with the institution; disruption of teaching, research, administrative, disciplinary, public service, or other authorized activity; violation of Board of Regents policies; or such other grounds as may be specified in the institution's statutes.

**146.** Those enumerated grounds appear in the same provisions that establish the dismissal process itself. Article XII does not authorize initiation of dismissal proceedings absent an enumerated ground and does not provide a mechanism by which the process may be invoked first and a qualifying predicate identified later.

**147.** Plaintiff's tenure interest therefore includes the protection that Article XII dismissal proceedings may be initiated only upon a cognizable enumerated ground. Defendant Vicino initiated Article XII proceedings on the asserted basis that Plaintiff could not perform her role on a "fully remote" basis and had declined reassignment. That asserted basis does not correspond to any enumerated ground under Article XII. No determination of professional incompetency, neglect of duty, specified misconduct, or other listed ground was made, and no medical board or faculty committee made the findings required for dismissal on grounds of physical or mental incompetency.

**148.** By invoking the dismissal mechanism in the absence of any qualifying ground, Defendant Vicino deprived Plaintiff of the threshold-condition protection that Article XII and Board of Regents Policy 08.03.09.01 embed within the tenure property interest.

**149.** This Count alleges a violation of procedural due process. See *McKinney v. Pate*, 20 F.3d 1550

32

(11th Cir. 1994). Plaintiff does not challenge the substantive wisdom of an employment decision. She challenges the use of the Article XII dismissal process in the absence of a qualifying predicate required by the governing rules that define her tenure interest.

150. The constitutional injury alleged in this Count is the initiation of Article XII dismissal proceedings itself. Initiation—not outcome—is the deprivation here. The injury is the unauthorized subjection of a tenured faculty member to the burdens, stigma, coercive pressure, and professional harm of the dismissal machinery in the absence of any cognizable Article XII predicate. No dismissal was required to complete the injury; no dismissal is required to seek relief from it. The constitutional injury began no later than the December 9, 2025 meeting, continued through Defendant Vicino's January 5, 2026 confirmation that dismissal proceedings had begun, and persists because Defendant Vicino's March 2, 2026 letter purported to discontinue proceedings only "at this time," leaving Plaintiff under a continuing threat of re-initiation on the same non-cognizable predicate and under the professional and reputational cloud created by proceedings that have never been formally repudiated as unauthorized.

151. The Eleventh Circuit requires a plaintiff seeking federal procedural due process relief to demonstrate the absence of an adequate state remedy. *McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994). That requirement is satisfied here. Georgia's available post-deprivation remedies—administrative review, mandamus, and state-court challenge— address the outcome of completed dismissal proceedings and presuppose a valid predicate. None provides a vehicle for challenging whether initiation of Article XII proceedings was lawful in the first instance. Article XII itself contains no pre-initiation review mechanism: the Hearing Committee examines whether charges are proven, a function that presupposes cognizable charges and does not adjudicate whether initiation was authorized. No faculty grievance procedure, Georgia administrative body, or state court has jurisdiction to adjudicate whether the stated predicate was cognizable under Article XII at all. The constitutional injury was complete upon initiation and continues so long as the proceedings remain subject to resumption on the same non-cognizable predicate. The claim is not that state remedies failed her. No state remedy addresses this injury at all.

152. The deprivation was compounded by the manner in which Defendant Vicino employed the dismissal process he had unlawfully invoked. The December 9, 2025 meeting constituted the Step 1 preliminary discussion required under Article XII—"discussion between the faculty member and appropriate administrative officers looking toward a mutual settlement." Defendant Vicino personally delivered the opening statement, asserting deficient performance across essential functions despite a

record containing only positive evaluations and unanimous promotion to Full Professor across multiple levels of institutional review. The University's General Counsel then presented three options: accept demotion to a non-tenure-track clinical position; resign; or face Article XII proceedings, with the explicit statement that "no additional alternatives exist." That statement converted the statutory mutual-settlement discussion into a coerced election, foreclosing both the good-faith dialogue Article XII contemplates and the continued interactive process the ADA required. When Plaintiff's counsel asked directly what essential responsibility Plaintiff had failed to perform, no answer was given. General Counsel further described the Article XII hearing as "open to the public, to others in the community," without disclosing that Article XII, Section 24(2) provides that the Hearing Committee, in consultation with the president and the faculty member, may determine whether the hearing should be public or private.

**153.** Defendants will likely contend that Plaintiff retains her tenure and therefore suffered no deprivation of a protected property interest. That contention misconstrues the full interest at stake. The value of tenure lies not only in continued employment but in the full bundle of protections the University Statutes confer, including the right not to be subjected to dismissal machinery absent a cognizable statutory predicate. Initiating Article XII proceedings without that predicate clouds the tenure interest and alters its character, value, and the conditions under which Plaintiff holds it. A suspended condemnation proceeding initiated under an inapplicable statute does not restore the property owner's interest to its unencumbered state merely because possession continues. The cloud, the coercive pressure, the professional stigma, and the expressly reserved right to resume are deprivation because they leave the tenure interest in an encumbered state.

**154.** As a direct and proximate result of Defendant Vicino's violation of Plaintiff's procedural due process rights, she has suffered professional stigma and career harm attendant to being a tenured professor subjected to formal Article XII proceedings without lawful predicate; harm to her professional reputation and collegial standing; physical harm, including stress-induced gastrointestinal injury requiring medical attention; emotional distress; and all other compensatory damages to be proven at trial. Punitive damages are available under 42 U.S.C. § 1983 where a defendant's conduct is motivated by evil motive or intent, or involves reckless or callous indifference to federally protected rights. *Smith v. Wade*, 461 U.S. 30, 56 (1983). Defendant Vicino's initiation of Article XII dismissal proceedings against a tenured professor without a cognizable statutory predicate, and his coercive administration of those proceedings, satisfies that standard. Plaintiff is therefore entitled to punitive damages against Defendant Vicino to the extent permitted by law.

## COUNT VIII

**Libel Per Se / Slander Per Se – Defamation Per Se**

**O.C.G.A. §§ 51-5-1, 51-5-3, 51-5-4**

**Against Defendant Grand River Solutions, Inc.**

**(Supplemental Jurisdiction Pursuant to 28 U.S.C. §1367(a))**

**155.** Plaintiff incorporates all preceding paragraphs.

**156.** This Court has supplemental jurisdiction over this claim pursuant to 28 U.S.C. §1367(a), as it arises from the same common nucleus of operative facts as Plaintiff's federal claims against Defendant Board of Regents and Defendant Vicino.

**157.** At all relevant times, Defendant Grand River Solutions, Inc. ("Grand River") was retained by Georgia State University to provide ADA/Section 504 consulting services, including case consultation regarding employee accommodation matters. According to GSU's EEOC position statement, during summer 2025, a Grand River consultant reviewed Plaintiff's accommodation file and communicated conclusions regarding Plaintiff's functional capacity and ability to perform the essential functions of her tenured Full Professor position. That recommendation characterized Plaintiff's medical documentation as stating that Plaintiff "was unable to come to campus" and therefore "could not carry out the essential functions of her current position." That characterization was false. The medical provider's actual written statement was that Plaintiff "rarely leaves her home." "Rarely" describes frequency or tendency; "unable" states categorical incapacity.

**158.** The precise modality of Grand River's communication to GSU—whether written, oral, or both— is not known to Plaintiff at the time of filing and is within Grand River and GSU's exclusive knowledge. Plaintiff therefore pleads this Count in the alternative as to modality pursuant to Fed. R. Civ. P. 8(d)(2). To the extent Grand River's communication was in writing, it constitutes libel per se under O.C.G.A. §§ 51-5-1 and 51-5-3. To the extent it was oral, it constitutes slander per se under O.C.G.A. § 51-5-4(a)(3). To the extent Grand River communicated the false characterization through both written and oral means, both provisions apply. Discovery will establish the modality or modalities through which Grand River transmitted its recommendation to GSU.

**159.** Whether written or oral, Grand River's characterization constitutes a false and defamatory statement concerning Plaintiff in reference to her trade, office, and profession, calculated to injure her therein, within the meaning of O.C.G.A. §§ 51-5-1 and 51-5-4(a)(3). A statement that a tenured full

professor is unable to perform the essential functions of her position bears directly on her professional fitness, standing, and continued employment. Damage is inferred as a matter of law and no allegation of special damages is required.

160. On information and belief, Grand River communicated this false characterization to GSU's Equity & Civil Rights Compliance Office and Office of Legal Affairs, satisfying the publication element under O.C.G.A. § 51-5-3. GSU's EEOC position statement further represented that, "[a]ccordingly," Georgia State University issued the August 1, 2025 accommodation decision stating that Plaintiff's provider documentation indicated she was "unable to be present on campus" and therefore unable to perform the essential functions of her position. That language tracked Grand River's characterization, not the provider's actual statement, and was thereafter repeated within the University to additional decisionmakers.

161. Although Grand River's communication may attract a qualified privilege under O.C.G.A. § 51-5-7, that privilege is defeated here under O.C.G.A. § 51-5-9. Under *Oskouei v. Matthews*, 321 Ga. 1, 912 S.E.2d 651 (Ga. 2025), to overcome a conditional privilege a private-figure plaintiff must show that the defendant's claim of privilege is a sham and that the defendant used the privilege merely as a cloak for venting private malice—that is, made the allegedly defamatory statement with ill will toward the plaintiff or with an intent to injure her. By GSU's own account, Grand River's practice lead had more than 35 years of experience in ADA/Section 504 compliance consulting. The divergence between what the provider wrote—that Plaintiff "rarely leaves her home"—and what Grand River transmitted—that Plaintiff "was unable to come to campus"—is not a matter of ambiguity or reasonable interpretation; "rarely" and "unable" are qualitatively different. On information and belief, Grand River made that substitution not in good-faith promotion of any legitimate accommodation-review purpose, but as a pretext to supply a disability-based rationale for an adverse employment outcome already sought by GSU. In using its consulting role in this manner, Grand River used any conditional privilege merely as a cloak for venting private malice, acting with ill will toward Plaintiff or with an intent to injure her, and the privilege is therefore defeated under O.C.G.A. § 51-5-9 as construed in *Oskouei*.

162. GSU relied directly on Grand River's false characterization in issuing the August 1, 2025 accommodation decision, which stated that Plaintiff was "unable to be present on campus" and therefore unable to perform the essential functions of her position. That language tracked Grand River's characterization, not the provider's actual statement.

163. As a direct and proximate result of Grand River's defamatory statement, Plaintiff has suffered harm to her professional reputation and standing, harm to her academic career, the initiation of formal

dismissal proceedings predicated on the false characterization, physical harm including stress-related gastrointestinal injury requiring medical attention, emotional distress, and all other damages to be proven at trial. Plaintiff is further entitled to punitive damages to the extent permitted by law, as Grand River's reckless disregard for the truth in a professional engagement for which it was specifically retained and compensated demonstrates that entire want of care raising the presumption of conscious indifference to consequences within the meaning of O.C.G.A. § 51-12-5.1(b).

## COUNT IX

### Negligent Misrepresentation (Pleaded in the Alternative)

### Restatement (Second) of Torts §552

### Against Defendant Grand River Solutions, Inc.

### (Supplemental Jurisdiction Pursuant to 28 U.S.C. §1367(a))

164. Plaintiff incorporates all preceding paragraphs and pleads this Count in the alternative to Count VIII. If the Court determines that Grand River's communication is privileged or otherwise not actionable as defamation, the same conduct gives rise to liability for negligent misrepresentation under principles adopted by Georgia courts from Restatement (Second) of Torts §552.

165. Section 552 imposes liability on one who, in the course of its business or profession, supplies false information for the guidance of others in their business transactions, where the supplier fails to exercise reasonable care in obtaining or communicating the information and the recipient justifiably relies on it to the pecuniary loss of the plaintiff.

166. Grand River is a professional ADA/Section 504 consulting firm that supplied information, including a characterization of Plaintiff's medical documentation and a recommendation regarding her functional capacity, to GSU's Equity & Civil Rights Compliance Office and, on information and belief, to the Office of Legal Affairs, for the purpose of guiding GSU's accommodation determination. This was not incidental communication but a core deliverable of Grand River's professional engagement. Grand River was retained and compensated specifically to provide this analysis, and GSU relied on its professional judgment in making accommodation decisions.

167. The information Grand River supplied was inaccurate. Plaintiff's medical provider stated that Plaintiff "rarely leaves her home." Grand River characterized that statement as indicating that Plaintiff "was unable to come to campus" and therefore "could not carry out the essential functions

of her current position." That characterization does not follow from the document it purports to summarize. "Rarely" describes frequency; "unable" states categorical incapacity.

**168.** Grand River failed to exercise reasonable care in obtaining and communicating this information. Whether Grand River failed to review the substantial record available—including Plaintiff's performance evaluations, promotion record, supervisor assessment, actual accommodation request, repeated written clarifications, and documented comparator accommodation—or reviewed that record and disregarded it, its recommendation was irreconcilable with that record. A firm of Grand River's stated expertise, retained and compensated for this purpose, either failed to obtain materials directly bearing on its recommendation or failed to heed them. Either constitutes a failure to exercise the reasonable care the engagement required.

**169.** GSU relied on Grand River's misrepresentation. GSU's August 1, 2025 accommodation decision recited that Plaintiff was "unable to be present on campus" and therefore unable to perform the essential functions of her position, and GSU attributed its reversal of its prior accommodation position to Grand River's review. That reliance was direct, documented, and outcome-determinative. That GSU also possessed information contradicting Grand River's characterization does not negate reliance; rather, it underscores the centrality of Grand River's recommendation in the decision-making process.

**170.** Plaintiff falls within the limited class of persons for whose benefit and guidance Grand River supplied the information, as required under Georgia law adopting Restatement (Second) of Torts §552. *Robert & Co. Associates v. Rhodes-Haverty Partnership*, 250 Ga. 680, 681–82 (1983). Grand River was retained specifically to review Plaintiff's accommodation file and to render a professional opinion for use by GSU decision-makers in determining what accommodation, if any, Plaintiff would receive. Grand River therefore knew, at the time it supplied the information, that Plaintiff was the specific individual whose employment, tenure, and compensation would be affected by its recommendation.

**171.** As of the filing of this Complaint, the full pecuniary consequences of Grand River's negligent misrepresentation have not been finally realized, as Plaintiff remains employed and continues to contest the adverse accommodation determination and its sequelae. This Count is therefore pleaded in the alternative, and damages are pleaded as contingent. If adverse employment consequences predicated on Grand River's misrepresentation are ultimately imposed, including but not limited to loss of tenure, reduction in salary, elimination of research responsibilities, or termination, those losses will constitute pecuniary harm directly and proximately caused by Grand River's negligent misrepresentation within the meaning of §552.

## VI. Prayer for Relief

WHEREFORE, Plaintiff Callie H. Burt respectfully requests that the Court enter judgment in her favor and grant the following relief:

- A trial by jury on all issues so triable;

- Judgment in Plaintiff's favor on the claims asserted herein;

- A declaration that Defendant Thomas J. Vicino, in his official capacity, violated Plaintiff's rights under Title I of the Americans with Disabilities Act; that Defendant Board of Regents of the University System of Georgia violated Plaintiff's rights under Section 504 of the Rehabilitation Act; and that Defendant Thomas J. Vicino, in his individual capacity, violated Plaintiff's rights under the Fourteenth Amendment to the United States Constitution;

- Appropriate preliminary and permanent injunctive relief against Defendant Thomas J. Vicino in his official capacity, and against Defendant Board of Regents to the extent permitted under Section 504, including relief restoring Plaintiff, as nearly as practicable, to the position she would have occupied absent the violations; requiring the provision of a reasonable accommodation; requiring Defendants to maintain the confidentiality of Plaintiff's medical information and prohibiting further unauthorized disclosure of diagnosis-specific information except as permitted by law; removal of the March 2024 reprimand and any reference to the August 2025 "Alternative Accommodation" proposal or Article XII dismissal proceedings from Plaintiff's personnel and evaluative files; restoration of meaningful and non-discriminatory access to faculty meetings, committee service, and other employment-related activities, including remote participation when required as a reasonable accommodation; prohibiting re-initiation of Article XII dismissal proceedings on any non-cognizable predicate arising from Plaintiff's accommodation requests or protected activity; and protection against further unlawful retaliation or other adverse action;

- Compensatory damages in an amount to be determined at trial against Defendant Board of Regents under Section 504 and against Defendant Thomas J. Vicino in his individual capacity under 42 U.S.C. § 1983, to the extent permitted by law;

- Punitive damages against Defendant Thomas J. Vicino in his individual capacity under 42 U.S.C. § 1983, to the extent permitted by law;

- Compensatory damages against Defendant Grand River Solutions, Inc. for defamation per se

39

under Georgia law, including damages for harm to Plaintiff's professional reputation and standing, harm to her academic career, physical harm, and emotional distress, in an amount to be determined at trial;

- Punitive damages against Defendant Grand River Solutions, Inc. under O.C.G.A. § 51-12-5.1(b), in an amount to be determined at trial;

- In the alternative, if the adverse employment consequences predicated on Grand River's negligent misrepresentation are ultimately imposed, compensatory damages against Defendant Grand River Solutions, Inc. under Restatement (Second) of Torts § 552 for all pecuniary losses proximately caused thereby, including but not limited to loss of tenure, lost compensation, and lost professional opportunities, including in connection with Plaintiff's pending grant applications, in an amount to be determined at trial;

- Reasonable attorneys' fees and costs as permitted by law;

- Taxable costs pursuant to 28 U.S.C. § 1920, including but not limited to court filing fees, service-of-process costs, deposition transcript costs necessarily obtained for use in this litigation, and copying costs for materials necessarily obtained, in an amount to be determined at trial;

- Such other and further relief as the Court deems just and proper.

Respectfully submitted,

Date: 04/09/2026

Callie H. Burt
Plaintiff, pro se
1002 Highgrove Dr.
Monroe, Georgia 30655

40

callieburt@gmail.com

Preferred contact: email